NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0020n.06

Case No. 21-2614

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 10, 2023
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA, )
    Plaintiff - Appellee, )
)
v. )
)
JAMES HONEYSUCKER, JR., )
    Defendant - Appellant. )
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

**Before: MOORE, GIBBONS, and LARSEN, Circuit Judges.**

GIBBONS, J., delivered the opinion of the court in which LARSEN, J., joined in full. MOORE, J. (pp. 18–21), delivered a separate opinion concurring in part and in the judgment.

**JULIA SMITH GIBBONS, Circuit Judge.** James Honeysucker, Jr. was convicted of four armed robberies by a jury. On appeal, Honeysucker alleges errors at each stage of his criminal proceeding: evidentiary suppression, trial, and sentencing. He asserts that the district court erred in denying the suppression motion for his cell phone records, which he claims were collected under a search warrant lacking the requisite particularity. Next, Honeysucker argues that the court abused its discretion at trial by permitting lay-witness testimony of an FBI agent to interpret Honeysucker's Facebook messages, which he claims misled the jury. Finally, Honeysucker claims that the court miscalculated his Sentencing Guidelines range. Honeysucker seeks vacatur of his sentence and remand for a new trial or, in the alternative, remand for resentencing.

A new trial is not warranted for Honeysucker. The district court properly denied Honeysucker's motion to suppress and allowed FBI Agent Bradley McIntyre's testimony at trial.

However, the government agrees that the district court erred in its calculation of the Sentencing Guidelines and joins Honeysucker's request for resentencing. We affirm Honeysucker's conviction, but because of the Guidelines calculation error, we vacate Honeysucker's sentence and remand for resentencing.

I.

In 2019, payday lenders in Battle Creek and Lansing, Michigan, experienced a string of armed robberies. In video footage and witness accounts of the robberies, a pattern emerged: a man enters the payday lender's store, holds a black pistol in the face of the cashier, hands the cashier a bag, demands all the cash on hand, and then takes the bag of money and flees. In late September 2019, a victim of one of Honeysucker's robberies tipped off police that she believed the robber was James Honeysucker, Jr., though she initially knew him by his nickname, "Ace." She further showed police a Facebook page associated with Honeysucker where he identified himself as "Ace Sohood PFFP."

On October 9, 2019, the Lansing Police Department sought and obtained two warrants related to Honeysucker. First, they obtained a warrant for T-Mobile records for a phone number belonging to him. The warrant covered subscriber information and geolocation data from August 10, 2019, to October 8, 2019, as it related to the crime of "shots fired into an occupied dwelling." DE 43, Warrant Appli., Page ID 117. Second, officers obtained a search warrant for Facebook records and content related to the "Ace Sohood PFFP" Facebook account. The warrant authorized police to search for and seize "[e]vidence of the crime of armed robbery" during the same period.[1] After those warrants were obtained, the robberies continued.

---

[1] Although obtained on October 9, 2019, the search of Honeysucker's Facebook records did not occur until October 31, 2019.

The final robbery occurred on October 22, 2019. Sergeant Ryan Strunk, the Battle Creek police department's lead investigator for the robberies, was alerted to the robbery and immediately drove to the scene. On surveillance video, Strunk observed a grey pickup truck. He then received a tip that Wilnell Henry, Honeysucker's cousin, was involved in the robberies. Strunk drove to the address on record for Henry and observed an identical grey pickup truck in the driveway. Strunk arrested Henry, who told police that Honeysucker had committed the robberies and showed police text messages with a phone number that he claimed belonged to Honeysucker. Henry further explained that Honeysucker feared that he was going to be caught, so Henry had dropped Honeysucker off at the Kalamazoo bus station. Henry reported that Honeysucker planned to take a bus to Chicago and then on to Phoenix, Arizona.

Battle Creek police immediately contacted dispatch to conduct an emergency "ping" of the phone number that Henry identified as Honeysucker's. The ping located the phone in a Chicago bus station. Battle Creek police contacted the Chicago Police Department and explained that they sought to execute a warrant for Honeysucker's arrest. Chicago police located Honeysucker in the bus station and immediately arrested him. Police searched Honeysucker and found a loaded semi-automatic pistol, approximately $17,000 in cash, and the phone registered to the same number identified as belonging to Honeysucker. Based on his possession of the pistol at the time of his arrest, Honeysucker was charged in the Circuit Court of Cook County, Illinois, with aggravated unlawful use of a weapon, to which he pled guilty.

In November 2019, FBI special agent Bradley Reese McIntyre, with cooperation from local police departments, initiated a criminal complaint against Honeysucker and Henry in federal court. On December 2, 2019, McIntyre sought and obtained a second search warrant for T-Mobile records associated with two phone numbers, one registered to Honeysucker and the other a new number

that Honeysucker obtained before the final robbery. The warrant application listed both the information that T-Mobile was obligated to disclose and the information that the government was authorized to seize. Per the warrant, T-Mobile was required to disclose all voicemails, text messages, call logs, business records, subscriber information, payment information, and other similar records, as well as a more circumscribed set of geolocation data generated between April 18, 2019 (one month before the first suspected robbery) to October 23, 2019 (the day after the last suspected robbery). Of that information, the government was authorized to seize only records related to the robberies and created from April 18, 2019 to October 23, 2019.

In January 2020, a federal grand jury indicted Honeysucker on seven counts related to four robberies that occurred in August, September, and October 2019. Honeysucker was charged with three counts of possessing and brandishing a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c)(1)(A)(ii), and four counts of interference with commerce by threats or violence under 18 U.S.C. § 1951(a), also known as Hobbs Act robbery.

Prior to trial, Honeysucker moved to suppress evidence derived from the searches of his cell phone and Facebook account. He argued that the warrants were overly broad, in violation of the Fourth Amendment's particularity requirement.[2] In August 2020, the district court held a joint suppression hearing to address both motions. For both warrants, the court explained that the inclusion of language limiting the government to investigating a particular crime provided "a proper limitation . . . that satisfies the particularity and overbreadth concerns that the defense raise[d]." DE 71, Suppression Tr., Page ID 381-82. Although the court denied both motions to

---

[2] Because the government relied only on the second phone records warrant (the one obtained by McIntyre on December 2) in its investigation, Honeysucker agreed that the second warrant was the only relevant phone records warrant for purposes of the suppression argument. The motion to suppress the fruits of the October 9 phone records warrant was denied as moot because the government did not rely on that warrant.

suppress based on its conclusion that the warrants were not overly broad, it noted that, in the alternative, the good-faith exception would "easily" cover the warrants and prevent the suppression of any seized information. *Id.* at 382.

Honeysucker's trial commenced on February 16, 2021.[3] The testimony relevant to this appeal is that of Agent McIntyre. McIntyre testified to evidence found on the "Ace Sohood PFFP" Facebook account. McIntyre testified that messages, between Honeysucker and a romantic partner, discussing his need to be "on the run," "lay low," and avoid her address for fear of being caught, reflect consciousness of guilt. At trial, Honeysucker's counsel objected to McIntyre's lay-witness testimony interpreting or describing what Honeysucker meant in his messages, asserting that the "words are very plain." DE 193, Corr. Trial Tr. III, Page ID 2187. The court overruled the objection, allowing McIntyre to explain the significance of specific messages.

The case went to the jury on the fourth day of trial. After several hours of deliberation, the jury found Honeysucker guilty on all counts.

The presentence report ("PSR") calculated Honeysucker's sentencing range under the Guidelines for each of the seven offenses. The three counts under 18 U.S.C. § 924(c)(1)(A)(ii) each carried a mandatory sentence of seven years, totaling twenty-one years, or 252 months. The remaining four counts under 18 U.S.C. § 1951(a) were grouped, and the PSR recommended a total offense level of thirty-four and criminal history category II. Relevant here, the PSR's criminal history category calculation was based on two points generated from two prior offenses: possession of a knife over three inches in 2014 and aggravated unlawful use of a weapon in 2019.

---

[3] Henry, Honeysucker's co-defendant and cousin, cooperated with the government and accepted a plea agreement in exchange for his testimony against Honeysucker. Henry testified against Honeysucker at trial, confessing that he had served as Honeysucker's getaway driver for each of the robberies in exchange for a cut of the proceeds and claiming that Honeysucker had recruited him for this role.

At the sentencing hearing, the court first considered Honeysucker's objections to the PSR's offense level computation. After sustaining some of those objections, the court lowered the offense level for the § 1951(a) violations to a total offense level of 33. Honeysucker did not object to the PSR's calculation of his criminal history category, so the court adopted the PSR's recommendation of criminal history category II. This calculation produced a Guidelines range of 151 to 188 months for the § 1951(a) counts.

The court went on to address the § 3553(a) factors with Honeysucker and his counsel. In addition to the arguments raised in his sentencing memorandum, counsel described Honeysucker's lack of significant prior criminal history and the deterrent nature of the twenty-one-year mandatory sentence that he would already be serving for the three § 924(c) counts. Honeysucker then briefly addressed the court, maintaining his innocence and asking the court to consider his lack of criminal record.

The court then sentenced Honeysucker to 252 months on the § 924(c) counts (the mandatory sentence) and 78 months on the § 1951(a) counts (a 73-month downward variance), for a total sentence of 330 months imprisonment. The court also imposed three years of supervised release to follow the term of imprisonment. Honeysucker timely appealed.

II.

We address Honeysucker's claims in turn: first we discuss the cell phone suppression motion, then McIntyre's trial testimony, and finally Honeysucker's sentencing.[4]

_____

[4] In Honeysucker's initial brief he additionally argued that Hobbs Act robbery is not a crime of violence. He acknowledged that the Sixth Circuit had squarely decided that Hobbs Act robbery *is* a crime of violence in *United States v. Gooch*, 850 F.3d 285, 290-92 (6th Cir. 2017). Honeysucker hoped, however, that a then-pending Supreme Court case, *United States v. Taylor*, 142 S. Ct. 2015 (2022), would change this classification. But *Taylor* held only that *attempted* Hobbs Act robbery did not count as a crime of violence. *Id.* at 2025-26. Honeysucker acknowledged in his reply brief that *Taylor* left the law applicable to his case unchanged and makes no further argument. Because

A.

"When considering the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo, considering the evidence in the light most favorable to the government." *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011). "We review de novo a district court's determination of particularity." *Id.* The party moving to suppress bears the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure. *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)).

The Fourth Amendment demands that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Particularity is required to prevent "general order[s] to explore and rummage" and avoid "the danger of unlimited discretion in the executing officer's determination of what is subject to seizure." *United States v. Greene*, 250 F.3d 471, 476-77 (6th Cir. 2001) (citations omitted). However, the level and type of particularity a warrant must contain is flexible to account for the crime involved and the types of items to be searched or seized. *Id.* at 477.

A warrant is valid when it is "as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999). We have crystalized this general guidance into a rule: "A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018); *see also United States v. Chaney*, 921 F.3d 572, 585 (6th Cir. 2019).

---

the defendant concedes that *Gooch* is controlling and Hobbs Act robbery is a crime of violence, we do not address the issue further.

Honeysucker argues that the warrant for the search of his phone records was overbroad, in violation of the particularity requirement. As proof, he points to the text of the warrant. Specifically, he directs the court to the first section of the warrant containing the items that T-Mobile was obligated to disclose, which include:

a. All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

b. All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from April 18, 2019 to October 23, 2019;

c. All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message; . . . .

DE 43, Warrant Appli., Page ID 144. As evident in the subset of items listed above, some of the records that T-Mobile was obligated to disclose had time limitations, and some did not. Honeysucker acknowledges that the second section of the search warrant authorized the government to seize information "that constitutes fruits, evidence, or instrumentalities of violations of 18 U.S.C. § 1951 [interference with commerce by robbery] during the period from April 18, 2019 to October 23, 2019." *Id.* at 146 (brackets in original). However, he argues that the warrant still constitutes "a general order to explore and rummage" because of the lack of temporal limitations for certain categories of records. CA6 R. 44, Appellant Br., at 24. He further argues that the two-step nature of the warrant, first listing the items that T-Mobile was obligated to disclose and then identifying the records the government was authorized to seize, does not cure the warrant's overbreadth issue because it permits the government to search *all* messages, subscriber information, and other data so long as that evidence can be linked to a robbery occurring between April 18, 2019, and October 23, 2019.

Honeysucker's arguments are unavailing. In *Castro*, following a string of armed robberies, police obtained a warrant for the search of the suspect's cell phone records—the same categories of cell phone records Honeysucker challenges here—pursuant to a warrant that contained no temporal limitations at all. *Castro*, 881 F.3d at 964. There, we held that the warrant satisfied the particularity requirement because it constrained the search to evidence related to the aggravated burglaries being investigated. *Id.* at 965. Likewise, in *Richards* we upheld a two-step warrant for the seizure and search of the entirety of a computer server because the warrant limited the items to be seized to a specific crime. *Richards*, 659 F.3d at 539-42.

In Honeysucker's case, the two-step warrant is limited to a specific crime. The government was authorized to seize only:

> All information described above [in the section describing what T-Mobile was required to disclose], that constitutes fruits, evidence, or instrumentalities of violations of 18 U.S.C. § 1951 . . . during the period from April 18, 2019 to October 23, 2019, consisting of:
> a. Records or communications, in any form, related to interference with commerce by robbery or the disposition of proceeds of the same;
> b. Records relating to the transfer or "porting" of a telephone number from one subscriber's account to another, from one device to another, or from one wireless provider to another; and
> c. Historical location information consisting of records of cell towers and sectors used by the account or identifiers listed on [a prior page] during the period from April 18, 2019 to October 23, 2019.

DE 43, Warrant Appli., Page ID 146. Item (c) is not in dispute because it contains the temporal limitation that Honeysucker demands. Items (a) and (b) are cabined by the list's header, which demands that the records constitute evidence of a specific crime. Item (a) further reiterates this limitation, explicitly referencing the crime to which the records must be related. Item (b) is implicitly subject to the same limitation and itself is extremely limited in subject-matter: allowing police to discover only whether a phone number was transferred to a different subscriber account

and information related to that transfer. Even if this type of record were not limited to a specific date range, it is far from a "general order to explore and rummage" as it is tied to a specific crime.

Furthermore, even if we assumed that the warrant should have included a temporal limitation, it would not help Honeysucker. As this court explained in *United States v. Neuhard*, 770 F. App'x 251 (6th Cir. 2019), the remedy for temporal overbreadth would be to "sever the infirm portion . . . from the remainder which passes constitutional muster." *Id.* at 254 (quoting *United States v. Blakeney*, 942 F.2d 1001, 1007 (6th Cir. 1991)). But Honeysucker makes no argument that any trial evidence or evidence that contributed to his conviction fail to match the relevant timespan of the robberies, meaning that there is no evidence to be severed for overbreadth. The cell phone records warrant satisfies the particularity requirements of the Fourth Amendment, and therefore Honeysucker's motion to suppress was properly denied.

B.

Turning to the trial phase, we review a district court's evidentiary rulings for abuse of discretion. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). A district court abuses its discretion if it "relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard." *Id.* (quoting *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014)). When an abuse of discretion occurs, it is subject to harmless error review. Fed. R. Crim. P. 52(a).

Federal Rule of Evidence 701 governs the testimony of lay witnesses. Law enforcement officers are often called to testify as expert witnesses to interpret conversations, text messages, and other evidence, but when called as lay witnesses they have a more limited role. *Kilpatrick*, 798 F.3d at 379. "[W]hen an officer is *not* qualified as an expert, the officer's lay opinion is admissible only when the law enforcement officer is a participant in the conversation, has personal

knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Id.* (internal quotations and citation omitted).

When officers interpret intercepted messages in which they neither participated nor observed first-hand, they can add information derived from their experience as an investigator on the case in order to be more helpful to the jury. *Id.* But we balance that benefit against several risks if the rule is applied too broadly, including that the jury might believe the officer has more knowledge to which they are not privy, that the officer's testimony might be purely speculative, or that the testimony might be used to admit inadmissible evidence. *United States v. Freeman*, 730 F.3d 590, 596 (6th Cir. 2013). An officer's lay testimony goes too far when it includes vague statements about the investigation, repeatedly relies on the general knowledge of the entire department or agency, or otherwise fails to limit the testimony to personal experience. *Id.* at 596-97.

During Honeysucker's trial, FBI agent McIntyre testified about the investigation and various pieces of evidence identifying Honeysucker as the owner of the phone and "Ace Sohood PFFP" Facebook account, including text messages, direct messages, photos, and internet searches. As part of his testimony, McIntyre discussed Facebook messages sent from the "Ace Sohood PFFP" account that had "significance to [his] investigation of who committed the[] robberies." DE 193, Corr. Trial Tr. III, Page ID 2185. In his testimony, McIntyre read or was asked about several messages from "Ace" to an alleged romantic partner, Alisha DeJaegher, and some of her replies, all of which occurred on September 23, 2019. *Id.* at 2185-88. McIntyre explained that the date of the conversation was significant because it occurred after the first two robberies but before the last two. *Id.* at 2187-88. Given the volume of messages, we include below a chart of the

messages that were read at trial and McIntyre's respective interpretation, characterization, or commentary:

| | |
|---|---|
| **Ace**: "I am about to have to lay DF low. You saying you want to fuck with me? I may be on the run. You saying you down for me? I'll drop all these bitches if that's what you saying. Won't entertain a sole, BM included." | **McIntyre**: "The significance is the user is stating that they are—they need to lay low and that they are on the run." |
| **DeJaegher**: "How are you going to be on the run and be here? You don't think your BM giving my address. Courts already have paperwork in your name with this address."<br><br>**Ace**: "Right, so they don't have shit. I panicked." | **McIntyre**: "This goes to show that the user was worried about, and the user and the respondent, Ms. DeJaegher, were worried about the user Ace Sohood being located potentially by law enforcement at her address." |
| **DeJaegher**: "Where did the fingerprint shit come from? You just said you are going to have to lay low. I am going to be so pissed if you miss the birth of your daughter yo."<br><br>**Ace**: "If they had it they would have been at her house or yours yo. I think they lying and hating and someone snitching giving my name but not going through the process. They not going to catch me, yo." | **Q**: "What's the significance of this?"<br><br>**Honeysucker's attorney**: "Your honor, I am going to object to him characterizing it. The words are very plain."<br><br>**The Court**: "Well, yeah, I think the special agent can say what he believes the significance is to the investigation and you can cross. Go ahead."<br><br>**McIntyre**: "The significance of this message indicates that someone was snitching on the Defendant, that someone was giving his name and that law enforcement was not going to be catching him." |
| **Ace**: "Don't tell nobody connected to me about your due date or anything. Not even Raynel." | **Q**: "Was that significant to your investigation?"<br><br>**McIntyre**: "Yes. It was."<br><br>**Q**: "And was it for the same basic reasons showing an attempt to flee?"<br><br>**McIntyre**: "Yes." |

DE 193, Corr. Trial Tr. III, Page ID 2186-88.

On appeal, Honeysucker argues that the court abused its discretion in overruling his objection to McIntyre's interpreting the Facebook messages while merely acting as a lay witness.

Honeysucker claims that McIntyre's interpretation misled the jury by implying that the messages showed "consciousness of guilt" without any foundation laid for McIntyre's personal knowledge that would make his testimony helpful to the jury. He asserts that McIntyre used the messages "to spoon-feed the government's theory of the case to the jury." CA6 R. 44, Appellant Br., at 37. He further argues that McIntyre's testimony invaded the province of the jury and prejudiced Honeysucker by "foreclos[ing] an alternative exculpatory reading [of the messages] without any evidentiary foundation for such foreclosure." CA6 R. 59, Reply Br., at 10. That is, Honeysucker claims that parts of the messages were actually exculpatory, but McIntyre put his own spin on them to avoid that reading. For example, the statement that he needed to "lay low" is inconsistent with the government's allegation that he committed another robbery a week later, and the statement that the witnesses against him were "lying and hating" calls into question the credibility of the witnesses against him. *Id.* at 9; CA6 R. 44, Appellant Br., at 38.

Honeysucker fails to establish that the court abused its discretion in denying the objection. First, an officer testifying as a lay witness can tell a jury why evidence was significant to the investigation because it "falls within the category of personal-experience testimony that Fed. R. Evid. 701 permits, rather than impermissible spoon-feeding of the Government's theory of the case." *United States v. Robinson*, 872 F.3d 760, 776 (6th Cir. 2017). In Honeysucker's case, the district court specifically instructed McIntyre to testify about what "the significance is to the investigation." DE 193, Corr. Trial Tr. III, Page ID 2187. Second, the "characterization" that McIntyre offered did little more than reiterate the content of the messages themselves or reflect reasonable inferences. Take, as an example, Ace's message that "someone snitching giving my name . . . . They not going to catch me, yo." McIntyre said the significance was "that someone was snitching on the Defendant, that someone was giving his name and that law enforcement was

not going to be catching him." *Id.* At one point, McIntyre explained that the messages reflected "an attempt to flee," but this was not a far or misleading logical jump given that the messages specifically stated that the author said he needed to lay low, might be on the run, and would not get caught. *Id.* at 2186-88.

Honeysucker concedes that "it would have been fair for the government to link these messages to other evidence to try to show consciousness of guilt for the charged offenses." CA6 R. 44, Appellant Br., at 37. In the context of his entire testimony, the Facebook messages served as a small link further confirming Honeysucker as the owner of the Facebook account by showing that messages sent from the account reflected consciousness of guilt, the need to be on the run, and fear of being caught by police—all while the robberies were ongoing. McIntyre's testimony also provides some interpretive value by sifting through Honeysucker's language in the messages that could be confusing to the jury in their entirety and confirming or clarifying the meaning of phrases containing slang. This contextual evidence concerning the investigation meets Rule 701's requirement that lay witness testimony be based on personal knowledge that is helpful to the jury, even by the defendant's own standard. Additionally, Honeysucker's argument that McIntyre brushed over exculpatory messages in the conversation ignores the role of the witness to explain the aspects of the messages that mattered in his investigation, not their overall meaning. *See Robinson*, 872 F.3d at 776. If Honeysucker believed that the messages were misconstrued on their face, it was a matter for cross-examination, as the judge noted when he overruled the objection.

Although McIntyre's testimony about the Facebook messages is brief and repetitive, it does add context about timing and consciousness of guilt. We believe that the evidence was properly admitted, but even if it were not, the admission of McIntyre's testimony would amount to harmless error. *See* Fed. R. Crim. P. 52(a) ("Harmless Error. Any error, defect, irregularity, or variance

which does not affect substantial rights shall be disregarded."). The trial evidence against Honeysucker was overwhelming and the discussion of his Facebook messages by McIntyre spans just a few pages of his broader testimony. Given the weight of the evidence and the minimal impact that could possibly have resulted from McIntyre's testimony, we conclude that the admission of his testimony amounted to harmless error, if any.[5]

C.

Finally, we address Honeysucker's sentence. When a Sentencing Guidelines calculation is challenged for the first time on appeal, we review the application of the Guidelines for plain error. *United States v. Barnes*, 822 F.3d 914, 924 (6th Cir. 2016). To prevail, the defendant must show: "(1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected [his] substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Id.* (citing *United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005)) (alteration in original). Generally, a district court plainly errs when it miscalculates the Guidelines range. *United States v. McCloud*, 730 F.3d 600, 603 (6th Cir. 2013) ("[A] district court's incorrect calculation of the applicable Guidelines range typically amounts to plain error.") (emphasis removed).

---

[5] As Honeysucker's counsel did not object until a significant portion of the Facebook messages had been read or discussed by the government, the earlier statements to which he did not object are arguably subject to plain error review. *United States v. Knowles*, 623 F.3d 381, 385 (6th Cir. 2008). "This plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.* (internal quotation marks omitted) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). However, as we conclude that the testimony's admission does not even reach the level of harmful error, we need not address this plain-error argument.

Honeysucker was sentenced to a total of 330 months' imprisonment, along with supervised release, restitution, and forfeiture. Both the government and Honeysucker agree that the district court plainly erred in its Guidelines calculation of his criminal history score.

The parties accurately identify the miscalculation of Honeysucker's criminal history score as plain error. In the PSR and at sentencing, Honeysucker was deemed to have a criminal history score of two, placing him in criminal history category II. However, one of these two points was from a firearm conviction that occurred on the same day as the last robbery, for the same weapon used in the robberies, when Honeysucker was in the process of fleeing to avoid capture or detection. Thus, it qualifies as "relevant conduct" for determining the base offense level under U.S.S.G. § 1B1.3(a)(1), making it "part of the instant offense" and not a "prior sentence" under U.S.S.G. § 4A1.2(a)(1). The Guidelines specifically emphasize that crimes committed "in the course of attempting to avoid detection or responsibility" for another offense constitute relevant conduct and are not included in the calculation of the criminal history score. U.S.S.G. § 1B1.3(a)(1); *see also* U.S.S.G. § 4A1.2(a)(1) Application Note 1; *United States v. Hall*, 632 F.3d 331, 336-37 (6th Cir. 2011). Because the Chicago firearms offense stemmed from Honeysucker's flight from the robberies in an attempt to evade law enforcement, it was plain error for the district court to consider it as a previous offense when calculating Honeysucker's criminal history score.

Furthermore, the error affected Honeysucker's substantial rights. Here, the district court should have corrected the PSR to reduce Honeysucker's criminal history score to one point, which would have placed him in criminal history category I instead of criminal history category II. U.S.S.G. §§ 4A1.1, 5A. With a criminal history category of I and a total offense level of 33, Honeysucker's Guidelines range for the § 1951(a) offenses would have been 135 to 168 months, lower than the 151 to 188-month range calculated at sentencing. "Where . . . the record is silent

as to what the district court might have done had it considered the correct Guidelines range, the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights." *Molina-Martinez v. United States*, 578 U.S. 189, 201 (2016). Here, the court expressly declined to say whether it would have made a different decision if the Guidelines were calculated differently. DE 192, Sentencing Tr., Page ID 2046 ("[W]hen you have as many moving parts in the guidelines like this, I'd be inclined, you know, not to say anything one way or another, and if the circuit thinks something needs to be changed we'll see and hear about it.").

Finally, "[i]n the ordinary case . . . the failure to correct a plain Guidelines error that affects the defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1911 (2018). The government and Honeysucker believe this to be such an ordinary case, and we agree.[6]

## IV.

For the foregoing reasons, we vacate Honeysucker's sentence and remand to the district court for resentencing.

---

[6] Honeysucker also claims that the district court erred at sentencing by failing to verify that he had read and discussed the PSR in accordance with Federal Rule of Criminal Procedure 32(i)(1)(A). However, this issue is now moot, as Honeysucker will have the opportunity on remand to discuss the report (or an amended report) with counsel before his resentencing.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment.** I agree with the majority that Honeysucker is entitled to resentencing and not a retrial, but I write separately to explain why I believe that Honeysucker's suppression and lay testimony challenges are unavailing.

Beginning with the suppression issue, Honeysucker argues that the search warrant authorizing law enforcement to search his phone records violated the Fourth Amendment's particularity requirement because it failed to include a sufficient temporal limitation on certain of the evidence to be searched and seized. The majority rejects this argument based in large measure on its application of our decision in *United States v. Castro*, 881 F.3d 961 (6th Cir. 2018). But *Castro* addressed a different kind of particularity challenge than the one Honeysucker raises here.

"The cases on particularity are actually concerned with at least two rather different problems: one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take; and the other is whether the category as specified is too broad in the sense that it includes items that should not be seized." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Upham,* 168 F.3d 532, 535 (1st Cir. 1999)). *Castro* addressed the first problem. There, we rejected a defendant's challenge to search warrants that he argued did not sufficiently describe the evidence that law-enforcement officers were to search for, stating that "[a] warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *Castro*, 881 F.3d at 965. Honeysucker's suppression motion, by contrast, implicates the second problem identified in *Richards*: he argues that the search warrant in his case authorized law-enforcement officers to search and seize phone records that had no connection to the robberies. *See* Appellant

Br. at 27–29. In other words, Honeysucker argues that the search warrant authorized the search and seizure of items for which there was no probable cause.

With this understanding, I would not reject Honeysucker's suppression challenge based on our admittedly broad statement in *Castro*. The search warrant in this case may have sufficiently "guide[d] and control[led] the agent's judgment in selecting what to take" by *Castro*'s standards and yet still have run afoul of the Fourth Amendment by authorizing the seizure of "items that should not [have] be[en] seized." *Richards*, 659 F.3d at 537; *see also United States v. Chaney*, 921 F.3d 572, 581 (6th Cir. 2019) (similarly differentiating between these two infirmities). That said, we need not decide whether the Fourth Amendment mandated the temporal limitation that Honeysucker proposes because the evidence he seeks to suppress would have been recovered even if the warrant had imposed that limitation. *See* Appellant Br. at 27–29 (identifying the evidence); *United States v. Neuhard*, 770 F. App'x 251, 254 (6th Cir. 2019) (resolving a similar challenge on this basis); *United States v. Carter*, 792 F. App'x 366, 369 (6th Cir. 2019) (same). I would resolve Honeysucker's suppression challenge solely on that basis.

Turning to the lay-testimony issue, Honeysucker argues that the district court should have excluded McIntyre's testimony concerning the Facebook messages. I agree. As the majority explains, we have set limits on the ability of law-enforcement officers to offer lay testimony interpreting or explaining conversations. For instance, a law-enforcement officer may appropriately draw on his or her personal experience to make "identifications" that help explain certain unfamiliar matters to the jury. *United States v. Kilpatrick*, 798 F.3d 365, 383–84 (6th Cir. 2015). And the officer may inform the jury of the significance of a piece of evidence to the overall investigation. *United States v. Robinson*, 872 F.3d 760, 774–76 (6th Cir. 2017). But in either instance, the officer must provide testimony that is helpful to the jury and not "spoon-fe[e]d his

interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Kilpatrick*, 798 F.3d at 380 (quoting *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013)); *see also United States v. Williamson*, 656 F. App'x 175, 188 (6th Cir. 2016) (law-enforcement officer's testimony concerning "the importance" or "the significance" of a recorded phone call that did not include coded language constituted "spoon-feeding" of the government's case that should have been excluded by the district court).

I would hold that certain of McIntyre's testimony should have been excluded or stricken for falling outside the parameters that our cases set. There are several instances in which McIntyre draws on his experience investigating the case to elucidate certain matters to the jury. He explains, for example, that a picture exchanged between the two Facebook profiles is the same as a picture seized from Honeysucker's phone, suggesting that one of the Facebook users is Honeysucker. R. 193 (Trial Tr. Vol. III at 135) (Page ID #2183). Honeysucker does not challenge this testimony and the district court did not abuse its discretion in admitting it. *See Robinson*, 872 F.3d at 774–76. In the challenged portion of his testimony, by contrast, McIntyre does not make any informative identification or, despite the prosecutor's and district court's suggestions, relate the conversations to the ins-and-outs of his investigation. Instead, McIntyre merely proffers his interpretation of what was being communicated in a conversation that the jury was adequately situated to read and interpret for itself. The district court abused its discretion in allowing the government to introduce that particular testimony. *See Williamson*, 656 F. App'x at 187–88.

Ultimately, however, I agree with the majority that the district court's admission of McIntyre's testimony was at most harmless error. As the majority notes, the challenged portion of McIntyre's testimony spans just a few pages and essentially parroted the Facebook messages. Indeed, Honeysucker's trial counsel objected to McIntyre's testimony on the basis that the

messages were "plain" and did not require additional explanation. R. 193 (Trial Tr. Vol. III at 139) (Page ID #2187). Further, the government produced overwhelming evidence of Honeysucker's guilt at trial separate and apart from McIntyre's testimony, *see* Appellee Br. at 6–10, and the district court instructed the jury on the difference between lay fact and lay opinion testimony, reducing the risk that the jury would misapprehend the significance of McIntyre's testimony. R. 191 (Trial Tr. Vol. IV at 18) (Page ID #1940); *see also Williamson*, 656 F. App'x at 188–89. Thus, the admission of McIntyre's testimony was harmless error.

For these reasons, I agree with the majority that Honeysucker's suppression and lay-testimony challenges do not warrant a retrial. And separately, for the reasons stated by the majority, I also agree that Honeysucker is entitled to resentencing.